AO 91 (Rev. 11/11) Criminal Complaint     AUSA Melody Wells (312) 353-1110

INTAKE JUN 2 1 2018

FILED JUN 20 2018

MICHAEL T. MASON
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SAMUEL HERRERA-FAJARDO

CASE NUMBER:

18CR 381

MAGISTRATE JUDGE MASON

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about June 7, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a) | possession with intent to distribute a controlled substance, namely, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, which heroin was recovered from a gray Chevrolet Trailblazer registered to Samuel Herrera-Fajardo |

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

DENNIS R. KING
Task Force Officer
Homeland Security Investigations (HSI)

Sworn to before me and signed in my presence.

Date: June 20, 2018

City and state: Chicago, Illinois

*Judge's signature*

MICHAEL T. MASON, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS | ss

## AFFIDAVIT

I, DENNIS R. KING, being duly sworn, state as follows:

1. I am a Task Force Officer (TFO) with the Homeland Security Investigations, and have been so employed since November of 2017. I have been employed with the Glendale Heights Police Department for 19 years and currently hold the title of detective. I was previously assigned to the DuPage Special Operations Group as well as the Drug Enforcement Administration (DEA) to investigate narcotics violations. Currently, as part of my duties as an HSI Task Force Officer (TFO), I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the federal controlled substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

2. This affidavit is submitted in support of a criminal complaint alleging that Samuel HERRERA-FAJARDO has violated Title 21, United States Code, Section 841(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging HERRERA-FAJARDO with possession with intent to distribute narcotics, I have not included

each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, law enforcement surveillance, draft translations of consensually recorded calls, text messages and physical evidence.

4. As described in this affidavit, between on or about June 4, 2018, and June 7, 2018, HERRERA-FAJARDO and other unknown individuals coordinated a narcotics transaction with an undercover law enforcement officer (UC-1). On June 4, 2018, HERRERA-FAJARDO provided UC-1 with a sample of a substance that field-tested positive for heroin. Subsequently, on June 7, 2018, HERRERA-FAJARDO met UC-1 for the purpose of selling approximately two kilograms of heroin.

## I. FACTS ESTABLISHING PROBABLE CAUSE

5. Based on information provided by UC-1, on May 31, 2018 UC-1 received a call from telephone number 484-644-5865 (UM1 Phone 1). The male caller (UM1) did not identify himself. During that conversation the price per kilogram was discussed. UM1 stated that the price would be "5-5." Based on my training and experience, I understand "5-5" to mean $55,000.00[1]. Furthermore, based on my

---

[1] The descriptions of conversations and text messages contained in this affidavit are summaries unless otherwise noted. These summaries and quotes are still in draft format and are not intended to be final summaries, transcripts, or quotations. Many of the communications described in this affidavit took place in Spanish and have been translated by UC-1. These translations are also in draft form. For some of the conversations summarized below, I have included my interpretation and understanding of the words and phrases used during the conversations. My interpretations and understandings are based on evidence gathered during the investigation to date; information received from UC-1; my training and

2

training and experience and conversations with other agents, the current market rate for a kilogram of heroin is approximately $43,000 - $48,000.

6.  Based on information provided by UC-1, on June 1, 2018, UC-1 received a phone call from telephone number 312-536-7339 (HF Phone 1) from an unknown man who asked to speak to "guero" and who stated he was calling on behalf of "primo". UC-1 later met the individual calling from HF Phone 1 in person and he was identified as HERRERA-FAJARDO. UC-1 compared the voice of HERRERA-FAJARDO to this caller and determined them to be the same person. HERRERA-FAJARDO stated he wanted to make arrangements with UC-1 so that they could meet later to provide UC-1 with a "photo" (a commonly used code word for a sample of narcotics). UC-1 stated he was unavailable to meet for several days and asked if they could meet early the following week and HERRERA-FAJARDO agreed. UC-1 and HERRERA-FAJARDO agreed to speak on the telephone to make further arrangements. This call was not recorded.

7.  According to UC-1, at approximately 9:37 a.m. on June 4, 2018 UC-1 received a call from HERRERA-FAJARDO, again using HF Phone 1. HERRERA-FAJARDO stated he would be free in the evening of June 4, 2018 after 6:00 p.m. HERRERA-FAJARDO asked if UC-1 was interested in seeing a "photo" (a sample of narcotics) and UC-1 acknowledged. HERRERA-FAJARDO stated he was located in the north side of Chicago near the intersection of Cicero Avenue and Diversey

---

experience as a law enforcement officer; and the training and experience of other law enforcement officers in this investigation with whom I have consulted.

3

Avenue. UC-1 agreed to meet with HERRERA-FAJARDO near HERRERA-FAJARDO's location later in the evening.

8. At approximately 1:26 p.m. on June 4, 2018, UC-1 received a call from UM1 using telephone number UM1 Phone 1. UM1 asked if UC-1 had received a call (which UC-1 understood to be in reference to HERRERA-FAJARDO). UC-1 acknowledged receiving the call from HERRERA-FAJARDO. This call was not recorded.

**HERRERA-FAJARDO Provided a Heroin Sample to UC-1 on June 4, 2018**

9. Between approximately 5:59 p.m. and 7:10 p.m. on June 4, 2018, UC-1 and HERRERA-FAJARDO engaged in a series of consensually-recorded telephone calls and text messages to coordinate the time and location of their meeting. They arranged to meet in the parking lot of a Walmart later that evening.

10. At approximately 7:18 p.m. on June 4, 2018, a surveillance officer observed a gray Chevrolet Trailblazer arrive in the parking lot of Walmart and park next to the Undercover Vehicle (UCV). Based on a review of DMV records, the gray Chevrolet is registered to Samuel HERRERA-FAJARDO at 2721 North Mason Avenue, Apt 2, Chicago, Illinois. The surveillance officer then observed the driver of the Trailblazer (later identified by UC-1 as HERRERA-FAJARDO) exit the front driver's side door and approach the front driver's side door of the UCV.

11. According to UC-1, HERRERA-FAJARDO approached the driver's side door of the UCV. HERRERA-FAJARDO then handed UC-1 a white plastic bag containing a brown powdery substance (suspected heroin).

4

12. HERRERA-FAJARDO told UC-1 that "they" (the kilograms of heroin) were ready for UC-1 when he wanted them. UC-1 confirmed that the price per kilogram was "5-5" ($55,000). HERRERA-FAJARDO asked UC-1 to agree on a price with UM1. UC-1 told HERRERA-FAJARDO, "let me check this first" (by which UC-1 meant that UC-1 would check out the sample HERRERA-FAJARDO had just given UC-1 and then UC-1 might be ready to purchase up to two kilograms of heroin). UC-1 asked HERRERA-FAJARDO when HERRERA-FAJARDO would be free to meet if UC-1 were to purchase heroin. HERRERA-FAJARDO again asked UC-1 to speak with UM1 and figure out the details for any future deals. UC-1 acknowledged and stated that UC-1 would be in contact with UM1. UC-1 asked HERRERA-FAJARDO if "they" (kilograms of heroin) had the original stamps/seals, and HERRERA-FAJARDO indicated that they did. Based on my training and experience heroin can have a brand or stamp that identifies the heroin distributor. When the original brands or stamps are still intact that indicates that the heroin was not diluted with a cutting agent.

13. Following the June 4, 2018 meeting, UC-1 texted UM1 and informed him that UC-1 met with HERRERA-FAJARDO.

14. The brown powder provided by HERRERA-FAJARDO field tested positive for the presence of heroin and had a total weight of 0.26 grams.

### Calls and Texts between HERRERA-FAJARDO and UC-1 Arranging a Heroin Transaction

15. On June 5, 2018, at approximately 11:54 a.m., UC-1 received a call from HERRERA-FAJARDO using telephone number 312-536-7339. During the

5

consensually-recorded call, HERRERA-FAJARDO stated he had not heard anything. UC-1 understood this to mean that HERRERA-FAJARDO's narcotics suppliers had not yet authorized the narcotics transaction for UC-1. UC-1 informed HERRERA-FAJARDO that UC-1 reached out to UM1 but had not heard back. UC-1 told HERRERA-FAJARDO, "I think it is going to happen. I just need to gather the invoices for the cars," meaning that UC-1 would purchase the kilograms of heroin from HERRERA-FAJARDO once UC-1 had the money together. Both UC-1 and HERRERA-FAJARDO advised that they would be in touch with each other when they heard back from UM1.

16. The same day, at approximately 8:24 p.m., UC-1 received a call from an unknown male (UM2) using telephone number 910-282-8543. During the consensually-recorded call, UM2 told UC-1 that UM1 was busy but would call UC-1 tomorrow. UM2 asked, "The guys want to know if you like the, if you like what they took you, if it was a hit or not?" UC-1 understood that UM2 was asking if UC-1 was still interested in purchasing heroin. UC-1 told UM2 that UC-1 "had the titles ready for two cars," meaning UC-1 was ready to purchase two kilograms of heroin. UC-1 asked UM2 if he would lower the price "because it was two cars" and UM2 agreed to lower the price per kilogram of heroin to "53-5" ($53,500.00) for each. UC-1 agreed to the price. UM2 asked UC-1 to confirm whether or not UC-1 would purchase the heroin by the following day. UM2 instructed UC-1 to contact either UM1 or UM2 to confirm.

17. On June 6, 2018, at approximately 1:25 p.m., UC-1 received a call from UM1 who was using UM1 Phone 1. UM1 asked if UC-1 had met with HERRERA-

6

FAJARDO and UC-1 confirmed that UC-1 had met with HERRERA-FAJARDO. UC-1 told UM1 that UC-1 spoke with UM2 and the two agreed that UC-1 would pay "53 and a half" ($53,500.00) per kilogram of heroin. UM1 stated he had already spoken with UM2 and was aware of the new price. UM1 asked UC-1 if UC-1 had the cash to purchase the kilograms and UC-1 told UM1 that UC-1 would be ready to purchase two kilograms of heroin on Thursday (June 7, 2018). UM1 stated he would tell HERRERA-FAJARDO to be ready to meet UC-1 on Thursday.

18. At approximately 8:27 p.m. on June 6, 2018, UC-1 called UM2 at telephone number 910-282-8543. During the consensually recorded call, UM2 asked UC-1 if UC-1 was going to purchase the kilograms heroin. UC-1 stated that he would be ready tomorrow (June 7, 2018) and would confirm in the morning. UC-1 asked that the quality be the same as the sample and UM2 assured UC-1 that it would be the same. UM2 asked UC-1 to inform UM2 when UC-1 wanted to meet and UM2 would then have HERRERA-FAJARDO meet UC-1. UM2 also told UC-1 that he wanted the meeting "not to take place on the street". Based on my training and experience, narcotics traffickers arrange for drug sales in private locations to avoid detection.

19. At approximately 8:31 p.m. on June 6, 2018, UC-1 called HERRERA-FAJARDO. During the consensually-recorded call, UC-1 told HERRERA-FAJARDO that UC-1 had spoken with UM1 and UM2 and that UC-1 would be able to meet HERRERA-FAJARDO the following day. HERRERA-FAJARDO stated he would meet with UC-1 then.

**Seizure of More Than Two Kilograms of Heroin from HERRARA-FAJARDO**

20. On June 7, 2018, at approximately 11:44 a.m., UM2 texted UC-1 and asked if UC-1 still planned to meet with HERRERA so that UM2 could contact HERRERA-FAJARDO to be ready. UC-1 stated that he was still going to meet today and that UC-1 was just finishing gathering all the money for the narcotics purchase.

   a. At approximately 12:47 p.m. on June 7, 2018, UC-1 received a call from HERRERA-FAJARDO. During the consensually-recorded call, HERRERA-FAJARDO asked what time UC-1 wanted to meet. UC-1 stated he would be free later in the day (June 7, 2018). HERRERA-FAJARDO asked UC-1 to give HERRERA-FAJARDO enough notice so that HERRERA-FAJARDO could be ready. UC-1 told HERRERA-FAJARDO that UC-1 would be able to meet around 5:00 pm. HERRERA-FAJARDO told UC-1 that HERRERA-FAJARDO would send UC-1 an address to meet.

21. Between approximately 1:26 p.m. and 1:33 p.m. on June 7, 2018, UM1 and UC-1 exchanged a series of text messages. During that time period UM1 sent a text message to UC-1 to see if UC-1 and HERRERA-FAJARDO had talked and agreed on a location to purchase "the car" (the heroin). UM1 asked UC-1 to meet HERRERA-FAJARDO inside of a residence to ensure everything would be done safely. UC-1 told UM1 that UC-1 was in contact with HERRERA-FAJARDO.

22. At approximately 3:51 p.m. on June 7, 2018, HERRERA-FAJARDO texted UC-1 the address of a motel on Elston Avenue in Chicago. At approximately 3:57 p.m., HERRERA-FAJARDO asked UC-1 "how many did you say there were"

(how many kilograms UC-1 planned to buy). UC-1 responded that the deal was for two kilograms. HERRERA-FAJARDO told UC-1 HERRERA-FAJARDO would wait for UC-1 inside the motel.

23. At approximately 5:03 p.m. on June 7, 2018, UC-1 called and told HERRERA-FAJARDO that UC-1 was on his way. HERRERA-FAJARDO stated he wanted to be able to examine the money. UC-1 assured HERRERA-FAJARDO the money was correct.

24. At approximately 5:30 p.m. on June 7, 2018, UC-1 sent a text message to HERRERA-FAJARDO that UC-1 was on his way and would be there in an hour, but would let HERRERA-FAJARDO know when UC-1 was close. HERRERA-FAJARDO replied, "Okay".

25. At approximately 6:10 p.m. on June 7, 2018, a surveillance officer observed HERRERA-FAJARDO driving his gray Chevrolet Trailblazer arrive at the parking lot of the motel and park. Law enforcement officers approached the gray Chevrolet and detained HERRERA-FAJARDO.

26. After he was detained, HERRERA-FAJARDO verbally consented to a search of his vehicle. During the search, law enforcement officers recovered two packages from a laundry bag in the back seat of the vehicle. One package weighed approximately 1.32 kilograms and the second package weighed approximately 1.225 kilograms. The contents of both packages field-tested positive for heroin.

27. HERRERA-FAJARDO also provided verbal and written consent to search his residence. During the search, law enforcement officers recovered two

packages from a crawl space in HERRERA-FAJARDO's bedroom. The first package weighed approximately 1.330 kilograms and the second package weighed approximately .600 kilograms. The contents of both packages field-tested positive for heroin.

28. HERRERA-FAJARDO also provided written and verbal consent to search HF Phone 1, his mobile telephone, which is assigned telephone number (312) 536-7339. A preliminary search of the phone revealed approximately 90 photographs of suspected heroin and 5 videos of suspected heroin being weighed on a digital scale.

FURTHER AFFIANT SAYETH NOT.

_____
DENNIS R. KING
Task Force Officer
Homeland Security Investigations

SUBSCRIBED AND SWORN to before me on June 20, 2018.

_____
MICHAEL T. MASON
United States Magistrate Judge